**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 17 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JOSEPH L. CASSARA,

        Plaintiff-Appellant/Cross-
        Appellee,

    v.

DAC SERVICES, INC.,

        Defendant-Appellee/Cross-
        Appellant.

Nos.   00-5021, 00-5026

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 98-CV-473-B)**

---

David F. Barrett (R. Deryl Edwards, Jr. with him on the brief), Joplin, Missouri, for the Plaintiff-Appellant/Cross-Appellee.

Larry D. Henry (Patrick W. Cipolla with him on the brief) of Gable & Gotwals, Tulsa, Oklahoma, for the Defendant-Appellee/Cross-Appellant.

---

Before **HENRY** and **BRISCOE**, Circuit Judges, and **JENKINS**, Senior District Judge.[*]

---

**JENKINS**, Senior District Judge.

---

[*]The Honorable Bruce S. Jenkins, United States Senior District Judge for the District of Utah, sitting by designation.

Plaintiff Joseph L. Cassara brought this civil action under the Fair Credit Reporting Act, 15 U.S.C. §§ 1681-1681t (2000) ("FCRA"), alleging that DAC Services, Inc. ("DAC"), a "consumer reporting agency" under the FCRA, has violated 15 U.S.C. § 1681e(b) (2000)[1] by failing to adopt appropriate procedures ensuring the accuracy of the reporting of his employment history in a DAC-prepared report furnished to prospective employers, and that DAC has failed to disclose to Cassara the identity of all of the recipients of that report, a violation of 15 U.S.C. § 1681g(a)(3)(A)(I) (2000).[2] DAC answered by denying liability and pleading a counterclaim alleging that Cassara's claims were frivolous and filed in bad faith.

On December 30, 1999, the district court denied Cassara's motion for partial summary judgment as to liability, dismissed DAC's counterclaim, and granted DAC's motion for summary judgment. Judgment was entered on January 3, 2000. Cassara filed a notice of appeal on February 2, 2000.

We have jurisdiction of this appeal pursuant to 28 U.S.C. § 1291 (1994). On appeal, the district court's grant of summary judgment is reviewed *de novo*, considering the evidence and all reasonable inferences drawn therefrom in the light most favorable to

---

[1]15 U.S.C. § 1681e(b) requires that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

[2]Cassara abandoned his § 1681g(a)(3)(A)(i) claim prior to any substantive ruling by the district court. (*See* Aplee. App. vol. II, at 372.)

the nonmoving party. *Cooperman v. David*, 214 F.3d 1162, 1164 (10th Cir. 2000).

Summary judgment is proper if the record shows "that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law." Fed.

R. Civ. P. 56(c). When, as in this case, the moving party does not bear the ultimate

burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by

identifying "a lack of evidence for the nonmovant on an essential element of the

nonmovant's claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).

To avoid summary judgment, the nonmovant must establish, at a minimum, an inference

of the presence of each element essential to the case. *Hulsey v. Kmart, Inc.*, 43 F.3d 555,

557 (10th Cir. 1994).

**FACTUAL AND REGULATORY BACKGROUND**

  **The Federal Motor Carrier Safety Regulations**

  In an effort to promote greater safety in the operation of large trucks on the

Nation's highways, in 1970 the United States Department of Transportation promulgated

the Federal Motor Carrier Safety Regulations ("FMCSR") establishing minimum

qualifications for commercial motor vehicle drivers and requiring employers to

investigate the driving record and employment history of prospective employees being

hired to drive large trucks. 49 C.F.R. §§ 390.1-390.37, 391.1-391.69 (2000). The

investigation of an applicant's driving record must include inquiries to "the appropriate

agency of every State in which the driver held a motor vehicle operator's license or

permit" during the preceding three years. 49 C.F.R. § 391.23(a)(1) (2000). The investigation of the applicant's employment record for the preceding three years "may consist of personal interviews, telephone interviews, letters, or any other method of obtaining information that the carrier deems appropriate," but the employer must maintain a written record as to each past employer that was contacted. 49 C.F.R. § 391.23(c) (2000).

The regulations require that drivers applying for employment likewise must disclose detailed information, including the "nature and extent of the applicant's experience in the operation of motor vehicles," a list of "all motor vehicle accidents in which the applicant was involved" during the three years preceding the application, "specifying the date and nature of each accident and any fatalities or personal injuries it caused," and a list of "all violations of motor vehicle laws or ordinances . . . of which the applicant was convicted or forfeited bond" during the three years preceding the application. 49 C.F.R. § 391.21(b)(6)-(8) (2000). A driver applicant must detail "the facts and circumstances of any denial, revocation or suspension of any license, permit, or privilege to operate a motor vehicle that has been issued to applicant," as well as furnish a list "of the applicant's employers during the 3 years preceding the date the application is submitted" indicating the term and reason for leaving employment. 49 C.F.R. § 391.21(b)(9), (10) (2000).

As used in these regulations, "accident" means:

an occurrence involving a commercial motor vehicle operating on a highway in interstate or intrastate commerce which results in:
  (i) A fatality;
  (ii) Bodily injury to a person who, as a result of the injury, immediately receives medical treatment away from the scene of the accident; or
  (iii) One or more vehicles incurring disabling damage as a result of the accident, requiring the motor vehicles to be transported away from the scene by a tow truck or other motor vehicle.

49 C.F.R. § 390.5 (2000). The definition expressly excludes an "occurrence involving only boarding and alighting from a stationary motor vehicle" or "only the loading or unloading of cargo." *Id.*

These FMCSR requirements establish a *minimum* standard for the evaluation of driver qualifications. The regulations also provide that trucking companies may enforce "more stringent requirements relating to safety of operation" than the general requirements found in the federal motor carrier safety regulations, 49 C.F.R. § 390.3(d) (2000), and may require driver applicants to provide information in addition to that required to be disclosed by the regulations. 49 C.F.R. § 391.21(c) (2000).

**DAC and FMCSR Investigations**

As often is the case, the federal regulation of one commercial activity gave birth to another new business opportunity—in this case, the gathering and reporting of drivers' records and employment histories for a fee. DAC was formed in 1981 to exploit that opportunity, first by building a database of truck driver employment histories. Beginning in 1983, DAC offered employment histories, employee driving records, and other reports to its trucking industry members nationwide, augmenting its database with information

-5-

reported by its participating employers.

In its own words, DAC acts as a "file cabinet," storing employment histories on terminated drivers for over 2,500 truck lines and private carriers from across the country. Participating member employers can access the DAC database, which currently contains over four million records, to gather key employment history information. DAC advertises that its employment history files comply with the federal regulations and are accepted by the United States Department of Transportation to satisfy Section 391.23(c) of the Federal Motor Carrier Safety Regulations, governing investigations of driver applicants' employment history.

**Cassara and DAC**

Joseph L. Cassara worked as a truck driver for Watkins Shepard Trucking, Inc. ("WST") from March to October 1994, and then for Trism Specialized Carriers ("Trism") from December 1994 through December 1996. After Cassara left employment with these companies, each company made reports to DAC concerning Cassara's driving record and employment history. DAC compiled this information into a report. It then furnished the report to other companies inquiring about Cassara.

WST initially reported two accidents involving Cassara.[3] According to WST, on June 28, 1994, Cassara struck another truck while trying to back his equipment into a

---

[3]WST submitted its information concerning Cassara to DAC on November 17, 1994. (Aplee. App. vol. II, at 441.)

customer's dock, causing $1,942.26 in damage to the other truck. (Aplee. App. vol. II, at 358.) The WST Safety Department reviewed the accident and determined it to be preventable. (*Id.*) On October 19, 1994, Cassara damaged a ladder while backing at a customer's place of business, an accident which WST's Safety Department determined also to be preventable. (*Id.* at 359.)

Based on the WST information, DAC's report on Cassara read as follows:

# OF ACCIDENTS (EQUIPMENT WAS INVOLVED IN AN ACCIDENT OR DAMAGED WHILE ASSIGNED TO THE DRIVER REGARDLESS OF FAULT): 2
* * * *
ELIGIBLE FOR REHIRE: NO
REASON FOR LEAVING: DISCHARGED OR COMPANY TERMINATED LEASE
STATUS: COMPANY DRIVER
DRIVING EXPERIENCE: MOUNTAIN DRIVING
EQUIPMENT OPERATED: VAN
LOADS HAULED: GEN. COMMODITY
WORK RECORD: COMPLAINTS
                    OTHER

(Aplee. App. at 441.)

Similarly, DAC reported the following accident data based upon information submitted by Trism:[4]

# OF ACCIDENTS (EQUIPMENT WAS INVOLVED IN AN ACCIDENT OR DAMAGED WHILE ASSIGNED TO THE DRIVER REGARDLESS OF FAULT): 6
* * * *
ELIGIBLE FOR REHIRE: REVIEW REQUIRED BEFORE REHIRING

---

[4]Trism submitted its information to DAC on June 27, 1997. (*Id.* vol. I, at 18.)

REASON FOR LEAVING: RESIGNED/QUIT OR DRIVER
TERMINATED LEASE
STATUS: COMPANY DRIVER
DRIVING EXPERIENCE: MOUNTAIN DRIVING
                                OVER THE ROAD
EQUIPMENT OPERATED: FLAT BED
LOADS HAULED: GEN. COMMODITY
                        MACHINERY
                        OVERSIZED LOADS
                        PIPE
WORK RECORD: COMPANY POLICY VIOLATION

(*Id.* at 442.)  At Cassara's request, Trism provided him with a list of the six reported

accidents in a letter dated August 26, 1997:

> On 8-26-95 backing out of the tractor shop at NIE Maryland terminal right side of tractor hit a parked trailer. $889.90 posted as collision damage.

> On 3-1-96 near Laural, Montana, hit a deer, $604.40 posted as damage.

> On 8-6-96 near Cleveland, Tennessee, turning around on parking lot damaging surface of parking lot.  To date no claim for damage has been paid.

> On 10-17-96, Ft. Worth, Texas, backing and struck a utility pole.  You have indicated that an employee of the Consignee was acting as a flagger for you on that occasion.  A claim for $719.53 is posted as damages.

> On 11-21-96 at Pekin IL, drove over lawn to exit parking lot and bottomed out blocking street.  To date no claim for damage has been paid.

> On 11-26-96 at Harrisburg, PA, pulling into parking space and rear of trailer cut trailer tire on another vehicle.  To date, no claim for damage has been paid.

(*Id.* at 360.)

In February 1997, and again in September 1997, Cassara contacted DAC, first

disputing the accuracy of the WST information, and later, the Trism information reflected in the DAC report.[5] DAC contacted WST and Trism to verify the disputed entries. WST verified its report on March 19, 1997, and Trism did so on October 7, 1997. (Aplee. App. vol. I, at 17; *see id.* vol. II, at 461-62.) WST amended its report on April 15, 1997, deleting one of the two "accidents" initially reported because WST did not have to pay a claim arising out of the event. (*Id.* vol. I, at 28.)

Upon further inquiry by DAC based upon Cassara's continuing dispute of its report, WST again verified its reported information, this time by letter dated October 16, 1997, detailing the reported accidents as well as a litany of company policy violations and disciplinary write-ups. (Aplee. App., vol. II, at 358-59.) As to the accidents, WST advised DAC that "WST's policy as it relates to accidents (was and continues to be) is to report all accidents to DAC which involve third party property damage if the accident is determined to be preventable." (*Id.* at 359.) WST also recounted several other occasions on which Cassara's vehicle had been damaged, including a "non-preventable accident" resulting in "damage (of unknown sources) to his driver side mirror of his assigned tractor." (*Id.* at 358.)[6]

_____

[5]On February 26, 1997, Cassara placed this consumer statement in his DAC file: "I was not involved in an accident. I am not aware of any complaints. I am not aware of what the term 'other' refers to." (*Id.* vol. II, at 437; *id.* vol. I, at 16-17.)

[6]WST also addressed the reference to "other" in DAC's report of Cassara's work record:

Finally, with regard to the word "other" as part of his work record,

(continued...)

As the district court pointed out in granting summary judgment, Cassara acknowledges that each of the *events* reported by WST and by Trism did occur. Those events remain uncontroverted facts for purposes of this appeal.

Cassara does not argue with history. Instead, he disputes DAC's reporting of these events as *accidents*. Reporting of accidents, Cassara urges, should be standardized by applying the definition found in 49 C.F.R. § 390.5 (2000). If the C.F.R. definition was applied to his own driving history, then no accidents would have been reported by either WST or Trism.

**The District Court's Ruling**

The district court granted summary judgment in favor of DAC, concluding that Cassara's complaint about inconsistent reporting of accidents "unsuccessfully attempts to circumvent the fact that the reports concerning his driving are, in fact, accurate," and that DAC "has established it followed reasonable procedures to insure maximum possible accuracy," entitling DAC to summary judgment on Cassara's claims brought pursuant to

---

[6](...continued)
> Mr. Cassara had problems following procedure as it relates to equipment inspection, dispatch communication and safety. This resulted in numerous complaints by the departments involved. Maybe Mr. Cassara would prefer to have a more specific definition of work record that would state that he failed to follow company policy despite repeated oral and written warning. If DAC changes the work record designation, I would suggest such language be used.

(*Id.*)

15 U.S.C. § 1681e(b). (Order, entered January 3, 2000, at 11.) The district court rejected Cassara's contention that DAC should be applying the C.F.R. definition of "accident," noting that "public safety is best protected by the broadest possible interpretation and reporting."[7] (*Id.* at 11& n.1.)

The district court's summary judgment ruling also denied—implicitly, at least—DAC's counterclaim against Cassara for costs and attorney's fees pursuant to 15 U.S.C. §§ 1681n-1681o (2000) for having to defend claims brought in bad faith or for purposes of harassment. The district court ordered that DAC was awarded its costs, but that "[e]ach party is to bear its own attorney fees."[8] (*Id.* at 12.) DAC has cross-appealed from that ruling.

**CASSARA'S FAIR CREDIT REPORTING ACT CLAIMS**

DAC acknowledges that its reporting activities are governed by the Fair Credit Reporting Act, 15 U.S.C. §§ 1681-1681t (2000), and that its employment history reports

---

[7]The district court discussed *Fumosa v. Energy Sharing Resources*, No. 96-C-50410, 1999 WL 436596 (N.D. Ill. June 28, 1999), in which another district court had concluded that "DAC has shown it followed reasonable procedures to insure maximum accuracy" in its reporting of driver employment history records to its member employers. *Id.* at *4. Plaintiff in *Fumosa* complained about DAC's use of the phrase "failed to report accident" to characterize his 90-minute delay in telephoning his employer to report a trailer fire. *Id.* at *2. The *Fumosa* court observed that "[a]ll of these terms have a specific meaning as DAC's standard report format and uniform terms were created in conjunction with members of the trucking industry." *Id.*

[8]In response to a letter from DAC counsel seeking clarification, the district court entered an order on February 7, 2000 stating that "the Court concluded Plaintiff's claim was not frivolous by awarding attorney fees as set forth in the Order." (Order, filed February 7, 2000, Aplt. App. vol I, at 158.)

are considered to be "consumer reports" governed by FCRA. (Aplee. App. vol. I, at 3 (Affidavit of Richard Wimbish, dated October 24, 1999, at 3 ¶ 8).) Section 607(b) of the FCRA, 15 U.S.C.A. § 1681e(b), reads: "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

The official Federal Trade Commission commentary elaborates upon the language of § 607(b):

> The section does not require error free consumer reports. If a consumer reporting agency accurately transcribes, stores and communicates consumer information received from a source that it reasonably believes to be reputable, and which is credible on its face, the agency does not violate this section simply by reporting an item of information that turns out to be inaccurate. However, when a consumer reporting agency learns or should reasonably be aware of errors in its reports that may indicate systematic problems (by virtue of information from consumers, report users, from periodic review of its reporting system, or otherwise) it must review its procedures for assuring accuracy. Examples of errors that would require such review are the issuance of a consumer report pertaining entirely to a consumer other than the one on whom a report was requested, and the issuance of a consumer report containing information on two or more consumers (e.g., information that was mixed in the file) in response to a request for a report on only one of those consumers.

16 C.F.R. Part 600 App. (2000).

To prevail in a private civil action under § 607(b), a plaintiff must establish that (1) the consumer reporting agency failed to follow reasonable procedures to assure the accuracy of its reports; (2) the report in question was, in fact, inaccurate; (3) the plaintiff suffered an injury; and (4) the consumer reporting agency's failure caused the plaintiff's

injury.  *See, e.g., Whelan v. Trans Union Credit Reporting Agency*, 862 F. Supp. 824, 829 (E.D.N.Y. 1994).

Cassara urges reversal of the district court's grant of summary judgment, arguing that the district court weighed and determined fact issues still in genuine dispute.  Cassara contends that as to "accident," DAC defines the term "so loosely . . . that there is absolutely no way of predicting what is or is not recorded on DAC's reports," that "DAC reported that Cassara had been involved in eight accidents . . . when he had arguably been involved in none," and that when asked, DAC "failed to conduct any substantial factual investigation" of the factual basis for its report. (Aplt. Br. at 46.)  Cassara further contends that this court should grant judgment in his favor on the question of liability and remand the matter to the district court "only on the issue of damages and attorney fees." (*Id.* at 47.)

Cassara complains that DAC accepts employers' reporting of accident data without taking adequate steps to ensure that the events reported as "accidents" are accurately and consistently characterized as such.  He asserts that DAC's reporting system is flawed because DAC "allows differences in reporting standards by different companies, making a driver employed by one company look worse than a driver employed by another for no other reason than the employer[s'] disparate reporting policies."  (Aplt. Br. at 8.)

DAC offers some broad-brush guidance to its member employers as to what events should be reported as accidents, but otherwise leaves to the employers the determination

whether a particular event should be characterized as an "accident." Cassara argues that DAC's passive approach to the problem of definition results in serious inconsistencies among the reporting practices of various member employers. One employer's reportable "accident" may be another employer's unreported non-chargeable loss. Without uniformity in reporting, a driver working for one employer may have several accidents reported, while a driver working for another employer may have fewer—or none—reported, even where the drivers' histories are equivalent. The difference is not one of driving record; it is a matter of employer reporting practices. This disparity, Cassara submits, proves unfairly misleading and renders the reporting inaccurate.

To resolve this problem, Cassara asserts that only those events that qualify as "accidents" under 49 C.F.R. § 390.5 (2000) should be reported as "accidents" by DAC. By limiting reporting of "accidents" to the C.F.R. definition, the reporting process gains uniformity. Enforcing the C.F.R. definition would eliminate misleading inconsistencies among employers reporting to DAC, resulting in even-handed treatment of driver histories concerning accidents.

DAC responds that its reporting procedures assure maximum accuracy of the data reported to its members; that its report concerning Cassara was accurate; that DAC investigated the underlying facts in a fashion that satisfies the requirements of the FCRA;[9]

_____

[9]DAC asserts that Cassara never presented his improper investigation claim before the district court, and should not be raising it for the first time on appeal. (Aplee. Br. at 13.)

and that the district court erred in dismissing DAC's counterclaim against Cassara seeking costs and attorney's fees for Cassara's filing an FCRA action in "bad faith" or "for the purposes of harassment." (Aplee. Br. at 12-13, 48.)

DAC contends that there is a common understanding in the trucking industry of what an accident is, and that DAC is justified in relying on the employers' application of that common understanding in their reporting of employee driving histories. The C.F.R. definition, DAC insists, proves too narrow, omitting many incidents in a driver's history that prospective employers want to know about. Applying the commonly understood meaning to the events of Cassara's employment history, DAC insists that both WST and Trism reported accurate information concerning Cassara's accidents, that the information is reflected accurately in DAC's report, and that if the report is accurate, "then the procedures utilized by the consumer reporting agency to create the report become irrelevant," and the court's inquiry need go no further. (Aplee. Br. at 15.)

**DAC'S REPORT ON CASSARA: WAS IT ACCURATE?**

Accepting DAC's suggestion that the "initial focus of this Court's inquiry is the accuracy of the report after DAC investigated Cassara's dispute," (Aplee. Br. at 16), we start from the uncontroverted premise that the events referred to in the verified WST and Trism reports did in fact occur. The events *as events* are not in dispute.

The dispute concerns the manner in which these events have been characterized— whether each event has been placed in the proper *category*: "accident" or "other." To

speak in a meaningful way about whether the placement of events in a specific category is "accurate," we must first apprehend the criteria that define the content and limits of the category.[10]

**What is an "accident?"**

DAC's approach to the reporting of driver accident data has been evolving in recent years, but at all times pertinent to this appeal, DAC has consistently treated "accident" as a self-evident term. DAC's September 1993 *Guide to Termination Record Form* instructed employers to "[r]ecord [the] total number of accidents, whether preventable or nonpreventable; chargeable or nonchargeable. The number of accidents does not necessarily reflect fault on the part of the driver involved." (Aplee. App. vol. II, at 435; *see also id.* at 396-97 (Deposition of Kent Ferguson at 29:8-30:4).)

DAC has since developed a more detailed reporting option, one made available to members beginning in April of 1997. (Aplee. App. at 433-34.) In the more detailed version, DAC's "accidents" category is divided into two more categories: "DOT recordable accidents" and "non-DOT accidents/incidents." A DOT recordable accident is an accident within the meaning of 49 C.F.R. § 390.5—the kind of accident that the federal regulations require to be listed in the employer's own records, and that Cassara agrees should be reported. A "non-DOT accident/incident" is an event that falls outside

---

[10]Originally, the Greek "noun *katēgoríā* was applied by Aristotle to the enumeration of all classes of things that can be named — hence, 'category.'" John Ayto, *Dictionary of Word Origins* 101 (1990).

the C.F.R. definition, but nevertheless is still thought of as an "accident" or an "incident."

(Aplee. App. vol. II, at 434.)[11]

By 1998, DAC had modified its driver employment history reporting format to read:

> The equipment was involved in an accident or damaged while assigned to the driver regardless of fault during the period of employment referenced above
>
> Number of Accidents/Incidents:    06
>
> No additional accident/incident information available

(*Id.* at 438.)  This statement indicates that while employed by Trism, Cassara was involved in six reported events—either "accidents," however defined, or "incidents" involving damage to his equipment.  But to say that the "equipment was involved in an accident" does not describe or explain what an accident is, or how to tell whether someone has had one.

Apart from the more recent reference to "DOT recordable accidents," and some generalized guidance as to the immateriality of fault, DAC has left the meaning of "accident" to be defined by its reporting employers:

> A.    I don't know that we normally get involved with discussing what a particular company's description of what an accident is.  We allow them a means to certainly give this information out. . . . They are the ones determining –
>
> Q.    What an accident is?

---

[11]Neither WST nor Trism used the more detailed form in reporting about Cassara.

A.     – what an accident is, what goes in that particular section of the form.

(Aplee. App. vol. II, at 399 (Deposition of Kent Ferguson at 32:13-21).)

**Words, Meanings, Categories, Criteria**

Common use of a common word invokes implicit criteria.  Absent common agreement, however, no implicit criteria come into play, and if the word is to have useful meaning—and if the category is to have a meaningful scope— some explicit criteria must be supplied to define the word, and to limit the category. Without common, agreed-upon criteria defining the scope of the category, "accident" may mean something different to each reporting employer.

Absent a common understanding or explicitly stated criteria, the reporting of numerical data grouped into the "accident" category necessarily would lack the precision needed to assure consistency.  Richard Wimbish, DAC's President, acknowledges this: "For the DAC report to be effective, it is best to have uniform terms in order to compare apples to apples."  (Aplee. App. vol. I, at 2 (Affidavit of Richard Wimbish at 2 ¶ 5).) Without consistency, the accuracy of the reporting is cast into doubt.

DAC recognized this problem in 1991, when it considered language to be added to its *Guide* indicating that "accident" included "preventable or nonpreventable; chargeable or nonchargeable" accidents without regard to fault:

> [S]ome companies were only putting chargeable accidents, some only preventable, some everything that occurred.  So we were getting very wide variance of what was included in that particular category.  So the definition

-18-

was being expanded to try and cover all that was being reported there, which was difficult.

(Aplee. App. at 410-11 (Deposition of Kent Ferguson at 58:21-59:2).) DAC revisited the problem in 1997 when it incorporated "incidents" into the category of reportable "accidents" in order to address the lack of agreement with many drivers as to what an "accident" is. As explained by DAC's President:

> [W]e have added the word "incident" along with the word "accident" and our report now states the number of "accidents/incidents". Our definition of "accident" to our customer has not changed. . . . The word "incident" was added because we have learned over the years that some drivers like to refer to minor accidents as "incidents" and that, to them, accidents were occurrences of a more serious nature. Further, there is no clear line or distinction between what is an "incident" or an "accident" and I believe that line normally depended upon the opinion of the driver in question with his attempt to limit what was an accident. Because of this mind set among many drivers, our consumer department received many driver disputes relating to the listing of accidents in their employment history reports. This created substantial work for that department. . . . We decided that the drivers might better understand that the report covered all "accidents" whether minor or major if we added "incident" to the term "accident". We did this and it seems to have lessened the number of disputes in this area and the workload of our consumer department.

(Aplee. App. vol I, at 11-12 (Affidavit of Richard Wimbish, dated October 24,1999, at 11-12 ¶ 22).) Thus, the inclusion of "incident" in the reporting of "accidents" used "a term on the face of the report that was familiar" to drivers and "better communicated what was being reported" by the employers, *viz.,* a broader usage of the term "accident" than many drivers had previously understood.[12] (*Id.*)

_____

[12]As John Wilson explains, "it does not matter what words we use to describe what,

(continued...)

Even with these efforts by DAC to clarify, member employers still rely largely upon their own criteria for reporting "accidents," "incidents," and "other" events worthy of note, and these criteria vary. Cassara asserts that WST "reports accidents that involve third party property damage that is determined to be preventable." WST itself avers that "[o]ur company chooses to report accidents that we deem to be preventable, or where the driver was at fault." (Aplee. App. vol. I, at 30 (Affidavit of Tom Walter at 4 ¶ 13).) Cassara asserts that Trism, on the other hand, "believes in reporting and considering all accidents, big and small, regardless of fault." (Reply Br. at 2.)

Cassara argues that this kind of variation is widespread. DAC responds that among its members, the meaning of "accident" is commonly understood. As one DAC representative explained, "accident is a very general term. Most people know what an accident is. . . ." (Aplee. App. vol. II, at 401 (Deposition of Kent Ferguson at 39:22-23).)

"In order for words to function in communication, they must *mean* something." ROBERT T. HARRIS & JAMES L. JARRETT, LANGUAGE AND INFORMAL LOGIC 113 (1956) (emphasis in original). If the meaning of "accident" is commonly understood, as DAC suggests, then what *is* that commonly understood meaning?

Dictionary definitions offer some guidance. *Webster's* says an accident is "[a] happening that is not expected, foreseen, or intended," or "an unpleasant and unintended

---

[12](...continued)
provided that we agree about the uses . . . ." JOHN WILSON, LANGUAGE AND THE PURSUIT OF TRUTH 43 (1960).

happening, sometimes resulting from negligence, that results in injury, loss damage, etc."
WEBSTER'S NEW WORLD COLLEGE DICTIONARY 8 (4th ed. 1999); *see also* WEBSTER'S II
NEW RIVERSIDE UNIVERSITY DICTIONARY 71 (1984) ("An unexpected and undesirable
event.").[13] *Black's Law Dictionary* defines "accident" as an "unintended and unforeseen
injurious occurrence." BLACK'S LAW DICTIONARY 15 (7th ed. 1999). According to one
insurance law treatise, where "in the act which precedes an injury, something unforeseen
or unusual occurs which produces the injury, the injury results through accident." 1A
JOHN A. APPLEMAN & JEAN APPLEMAN, INSURANCE LAW AND PRACTICE § 360, at 455
(rev. vol. 1981).

DAC's President suggests that "[t]he term 'accident' is used in its ordinary sense
in the motor carrier and insurance industries, i.e., an unexpected occurrence." (Aplee.
App. vol I, at 11 (Affidavit of Richard Wimbish, dated October 24, 1999, at 11 ¶ 21).)
Another affiant avers that "an 'accident' as used in the motor carrier industry is merely an
unanticipated event as defined by the National Safety Council." (Aplee. App. vol. I, at 33

---

[13]    Etymologically, an accident is simply 'something which happens' — 'an
event.' That is what the word originally meant in English, and it was only
subsequently that the senses 'something which happens by chance' and
'mishap' developed. It comes from the Latin verb *cadere* 'fall' . . . . The
addition of the prefix *ad-* 'to' produced *accidere*, literally 'fall to,' hence
'happen to.' Its present participle was used as an adjective in the Latin
phrase *rēs accidēns*, 'thing happening,' and *accidēns* soon took on the role
of a noun on its own, passing (in its stem form *accident-*) into Old French
and thence into English.

JOHN AYTO, DICTIONARY OF WORD ORIGINS 4 (1990).

(Affidavit of David M. Kuehl, dated September 9, 1999, at 2 ¶ 4).)

In fact, the National Safety Council has formulated an American National Standard *Manual on Classification of Motor Vehicle Traffic Accidents*, now in its sixth edition. *See* National Safety Council, *ANSI D16.1-1996 Manual on Classification of Motor Vehicle Traffic Accidents* (American National Standards Institute, Inc. 6th ed. 1996) (hereinafter "*ANSI D16.1-1996*"). According to *ANSI D16.1-1996*, "An accident is an unstabilized situation which includes at least one harmful event." *Id.* at 13 ¶ 2.4.6. An "unstabilized situation" is defined as "a set of events not under human control. It originates when control is lost and terminates when control is regained or, in the absence of persons who are able to regain control, when all persons and property are at rest." *Id.* at 12 ¶ 2.4.4. A "harmful event" refers to an occurrence of injury or damage." *Id.* at 11 ¶ 2.4.1. *ANSI D16.1-1996* also refers to a "collision accident," that is, a "road vehicle accident other than an overturning accident in which the first harmful event is a collision of a road vehicle in transport with another road vehicle, other property or pedestrians," and a "noncollision accident," meaning "any road vehicle accident other than a collision accident." *Id.* at 19 ¶¶ 2.6.2, 2.6.3.[14]

To date, DAC has not adopted the *ANSI D16.1-1996* definitions of accidents. The

_____

[14]Under *ANSI D16.1-1996*, a noncollision accident includes an overturning, jackknife, accidental carbon monoxide poisoning, explosion, fire, breakage of part of the vehicle, and occupant hit by an object in or thrown against the vehicle or from a moving part of the vehicle, objects falling on or from a vehicle, a toxic spill or leakage, among others. *Id.* at 19 ¶ 2.6.3.

-22-

*ANSI D16.1-1996* definition nevertheless proves to be instructive: an "accident" generally involves at least one "harmful event," one "occurrence of injury or damage." At least one DAC witness defined "accident" in similar terms: "An unexpected event that involved damage to company equipment or someone else's property or person." (Aplee. App. vol. II, at 463 (Deposition of Alicia Jeffries at 9:10-11).)

In its brief, DAC seems to argue that the occurrence of damage or injury is not essential to an "accident," that an "unexpected occurrence" or "unanticipated event" would be sufficient. (*See* Aplee. Br. at 31.[15]) Yet there are many "unexpected occurrences" or "unanticipated events" encountered by commercial truck drivers and other motorists on a daily basis—occurrences and events that few would characterize as "accidents."

What criteria really define the category?

DAC's brief asserts that "DAC has defined each term in its report," and that "there was never a misunderstanding with the motor carriers regarding what was being reported." (*Id.* at 25.) This assertion may overstate things a bit.

From the materials in the record now before the court, it seems clear that DAC, responding to industry needs and concerns, intends "accident" to have a broad scope, and

[15]On the next page of its brief, DAC argues that "when a driver takes his heavy equipment over lawns, landscape and weaker hard surfaces, and causes damage, an accident has occurred," suggesting that the occurrence of damage defines the accident, even absent an unanticipated event. (*Id.* at 32.) This is not the only time that DAC's brief appears to argue seemingly contradictory propositions.

that DAC leaves it to the employers to define that scope according to their own needs.

Those needs reach beyond concerns about highway safety to matters of economics and

profitability. As DAC's President explains:

> In my experience, drivers want to minimize the lesser accidents because they view these accidents differently than do the employers. Our members have made it very clear to DAC over the years that they want these minor accidents reported. A driver who has a record of breaking off mirrors, cracking fenders, wind guards, tearing off hinges, etc. can be *a non-profitable driver*.

(Aplee. App. vol. I, at 10 (Affidavit of Richard Wimbish, dated October 24, 1999, at 10 ¶

20) (emphasis added).) Inclusion in DAC reports of "minor" accidents or "incidents" in

which equipment was "damaged while assigned to the driver regardless of fault" thus

speaks to economic concerns—driver profitability and company loss prevention—as well

as public safety concerns. In explaining to Cassara's counsel why DAC's reporting of

accidents is broader than the C.F.R. definition, counsel for DAC wrote:

> Let me give you a couple of examples of why the DAC definition is broader that the DOT's definition. Driver A may continually break off mirrors, hinges, doors, wind guards, etc. on the equipment entrusted to him. *As a result, Driver A is not a profitable driver. His carelessness takes the profit out of the load.* None of these incidents would fall under the DOT definition of accident. *The DOT does not care how profitable a particular load is, but the employer does.* Driver B has accidents of backing into fixed objects, e.g., docks, buildings, light poles, cars, trucks, etc. No one was killed or injured, nor did serious property damage occur, but this is obviously a driver who does not pay sufficient attention and he would have killed someone except by the grace of God there was no one in the way. When selecting a driver, a company would prefer, if it has a choice, to pick a driver with the best driving record. The quality of drivers is not only measured by the results of their inattention. . . .

-24-

(Aplee. App. vol. II, at 385-86 (emphasis added).)   As discussed above, in responding to these concerns, DAC has attempted to integrate "incident" with "accident" in order to encompass even "minor" occurrences involving damage to equipment or property, regardless of driver fault.[16]  In its optional reporting forms, employers may distinguish "DOT recordable accidents" from other accidents or incidents outside of the C.F.R. definition. But even these more recent efforts have stopped short of explicitly defining what DAC means by the term "accident."

> When we don't know the meaning of a word, or when we suspect we may have connected the wrong meaning with the right word, or when for us a word is ambiguous or vague, we feel the need for a definition.  We may ask, "What does this *word* mean?"  Or we may ask, "What do *you* mean by this word?"  In the former case, the supposition is that the word has some standard, regular, normal, correct meaning.  In the latter case there seems to be implicit the recognition that a word's meaning may vary with its user.

ROBERT T. HARRIS & JAMES L. JARRETT, LANGUAGE AND INFORMAL LOGIC 113 (1956) (emphasis in original).

Whatever the "common understanding" of the term "accident" among DAC's member employers may be, or whatever DAC chooses "accident" to mean, DAC remains

---

[16]Having explained the employers' need for accurate information concerning all of a driver's "minor" accidents and incidents, (Aplee. Br. at 20-23), DAC's brief inexplicably asserts that "if the driver has six accidents within the DAC definition, an employer can opt to report none, one, or any number up to six. *Any report in each of these scenarios would be accurate*." (*Id.* at 33 (emphasis added).)   This proposition would seem to defeat DAC's stated purposes for reporting accident data involving drivers in the first place. (*See id.* at 21 ("Obviously, trucking companies want to have as much knowledge as possible about a driver's safety record.").)  DAC's assertion only invites omissions and inconsistencies in the reporting process that guarantee *in*accuracy.

somewhat at a loss to articulate it. The criteria defining the category of "accidents" reported on its forms remain largely implicit.

**Were Cassara's Reported Events "Accidents"?**

On their face, in 1997 and today, DAC's reports concerning Cassara indicate that as to the "accidents" reflected in each report, "*[t]he equipment was involved in an accident or damaged while assigned to the driver regardless of fault during the period of employment referenced above*." (Aplee. App. vol. II, at 437-42.) The district court read this language to mean that "[a] DAC report includes accidents a driver may have regardless of the seriousness," and that the DAC report "contains the objective fact that damage occurred to the equipment while it was assigned to the driver." (Order, entered January 3, 2000, at 4 ¶10.)

In this instance, however, a close look at the DAC reports reveals that neither of these readings is entirely correct.

The evidence in the present record indicates that DAC's reports on Cassara do *not* include all of Cassara's accidents while employed by WST, "regardless of the seriousness." When Cassara disputed the initial DAC reporting in 1997, WST removed one of two "accidents" it had reported three years earlier. Subsequently, a WST representative indicated that Cassara had as many as *four* "accidents" while driving for WST, only one of which is currently reflected in the DAC report. (Aplee. App. vol. I, at 28 (Affidavit of Tom Walter, dated September 9, 1999, at 2 ¶¶ 5-6).) Cassara disputes

-26-

whether the events were "accidents" at all.

The verification that DAC obtained from Trism reflects events which Cassara argues were neither "accidents" nor "incidents" even as DAC uses those terms. According to Trism, on August 6, 1996, near Cleveland, Tennessee, Cassara turned around on a private parking lot, apparently damaging the surface of the parking lot. Cassara's truck and trailer were not damaged.[17] He did not collide with any other vehicle or object. Trism indicated to Cassara that no claim for damage has been paid.

Similarly, Trism verified that on November 21, 1996, at Pekin, Illinois, Cassara drove over a lawn to exit a parking lot and "bottomed out" his trailer, blocking the street.[18] It appears his equipment was not damaged; instead Trism noted damage to

_____

[17]When queried at deposition about whether such an event is an "accident," one DAC representative responded as follows:

> Q.      So if a driver were to drive over a parking lot and crack the parking lot, should that be listed under number of accidents?

> A.      If he did no damage to the truck or trailer, I would say no.

(Aplee. App. vol. II, at 402 (Deposition of Kent Ferguson at 45:12-16).)  In subsequently submitted corrections, the witness changed his answer to "It would depend upon the facts," noting that his original answer "was incorrect."  (Aplee. App. vol. II, at 430.)

[18]In describing this event to the district court, DAC argued that this event was "reminiscent of the movie 'Smokey and the Bandit'.  Plaintiff pulled his rig into a shopping center lot at night to go to sleep.  When he awoke the next day, surprise, surprise, the parking lot was filled with customer's automobiles.  Plaintiff was blocked in, but that did not deter the plaintiff.  He took off over the shopping center's lawn and eventually got stuck and needed to be towed. . . ."  (Aplee. App. at 106 (citing Deposition of Joseph Cassara, dated May 24, 1999, at 103:4-104:16, Aplee. App. vol II, at 326-27).)

(continued...)

-27-

"landscaping," but advised Cassara that no claim for damage had been paid.[19]

DAC's Senior Consumer Representative avers that each of these events, like the others reported by Trism, "was, in fact, an accident as that term is normally understood and as DAC defines it in its reports." (Aplee. App. vol. I, at 19 (Affidavit of Lynn Miller, dated September 9, 1999, at 3-4 ¶ 6).) Cassara disagrees. Without explicit criteria to apply in defining the category, resolution of the issue in this forum proves to be difficult.

**The Question of Accuracy Raises a Genuine Issue**

This court need not decide the question whether these events, or any others, should be placed in the category of "accidents," or "accidents/incidents," or whether they are best listed as "other" events about which interested parties may inquire further. The question is whether, drawing all reasonable inferences in favor of Cassara, the district court was correct in concluding that DAC had shown that no genuine issues of material fact exist and that DAC is entitled to judgment as a matter of law concerning the accuracy of its reports.

The district court soundly rejected Cassara's assertion that DAC should report only

_____

[18](...continued)
According to Cassara, "the bottom of the trailer bottomed out on the crown of the road. So I had called a tow truck myself and paid for it myself, and it just needed a slight pull to get it going . . . ." (Aplee. App. vol. II, at 326.)

[19]This may indeed have been an "unexpected occurrence," but it seems doubtful that DAC's member employers would uniformly agree that a trailer becoming stuck on the crown of the road would constitute a reportable "accident." DAC argued to the district court that it "was an obvious accident, non-collision, but an accident nonetheless." (Aplee. App. vol. I, at 106.)

accidents within the meaning of 49 C.F.R. § 390.5. By the regulations' own terms, employers may investigate driver employment histories and driving records beyond the minimum standards established by the regulations themselves. As the present record amply demonstrates, the motor carrier industry's needs and concerns involving drivers extend to a range of past accidents, incidents, mishaps, occurrences and events well beyond those encompassed by § 390.5. DAC's reporting system seeks to satisfy those needs and concerns as well as the federal regulatory requirements.

However, the district court's conclusion that Cassara's only basis for claiming that DAC's reporting was inaccurate "is his belief that terms should be defined in the best light toward him" does not resolve the question of whether the reporting was in fact accurate in light of whatever definitions or criteria *do* apply, or the more fundamental question whether absent an explicit definition of "accident," DAC has "followed reasonable procedures to insure maximum possible accuracy" as required by the FCRA. The district court's grant of summary judgment in this regard may well have been premature.

On the present record, it seems apparent that at least one of Cassara's former employers, WST, applies criteria in reporting drivers' accidents that materially differ from those urged by DAC as being commonly understood and applied by its reporting employers, and that DAC has been made aware of this. If, as DAC's President suggests, for "the DAC report to be effective, it is best to have uniform terms in order to compare

apples to apples," then discrepancies among employers as to what it treated as a reportable accident become important. Cassara has pointed out such discrepancies, albeit at best a minimal showing on the present record.

We conclude that Cassara has raised a genuine issue of material fact as to (1) whether DAC's reports reflecting one accident while he was employed at WST and six accidents while he was employed at Trism are in fact "accurate" within the meaning of the Fair Credit Reporting Act, and (2) whether DAC failed to follow reasonable procedures to assure the accuracy of its reports—specifically, whether DAC is or should be reasonably aware of systematic problems involving the reporting of "accidents" by its member employers.

It certainly is not this court's role to define what an "accident" is for the use and benefit of the motor carrier industry. We affirm the district court's ruling declining to prescribe that DAC's reporting of accidents be limited to "accidents" within the meaning of 49 C.F.R. § 390.5 (2000). But if employers in that industry are to communicate meaningfully among themselves within the framework of the FCRA, it proves essential that they speak the same language, and that important data be reported in categories about which there is genuine common understanding and agreement. Likewise, if DAC is to "insure maximum possible accuracy" in the transmittal of that data through its reports, it may be required to make sure that the criteria defining categories are made explicit and are communicated to all who participate.

As the FTC Commentary suggests, if DAC "learns or should reasonably be aware of errors in its reports that may indicate systematic problems," then "it must review its procedures for assuring accuracy." 16 C.F.R. Part 600 App., at 508 (2000). "If the agency's review of its procedures reveals, or the agency should reasonably be aware of, steps it can take to improve the accuracy of its reports at a reasonable cost, it must take any such steps. It should correct inaccuracies that come to its attention." *Id.* Not only must DAC review its own procedures, it "must also adopt reasonable procedures to eliminate systematic errors that it knows about, or should reasonably be aware of, resulting from procedures followed by its sources of information," *id.*, in this case, its member employers. DAC may require a reporting employer who frequently furnishes erroneous information to revise its procedures "to correct whatever problems cause the errors." *Id.* DAC, then, is in a position to require its member employers to report accidents according to a uniform definition that DAC may articulate.

As DAC acknowledges, Cassara has not been alone among drivers in expressing concern about DAC's use of the term "accident" in reporting driving histories. DAC has already taken steps to address some of those concerns and to better communicate to both employers and drivers the meaning of the data it reports.

There may be more steps that need to be taken, or there may not.

We do not decide that today. We simply hold that Mr. Cassara has raised a triable issue as to whether DAC's reporting about his accident history is accurate, and whether

DAC must review its procedures for assuring accuracy, and if warranted, take additional steps to assure maximum accuracy as required by the Fair Credit Reporting Act.[20]

**CONCLUSION**

This court concludes that Joseph Cassara has raised a genuine issue of material fact concerning his claim of inaccurate reporting of his employment history accident data by DAC Services, Inc. under § 607(b) of the Fair Credit Reporting Act, 15 U.S.C. § 1681e(b) (2000), and specifically, his allegations that (1) DAC failed to follow reasonable procedures to assure the accuracy of its reports of numbers of accidents; and (2) the report in question here was, in fact, inaccurate. To that extent, the district court's judgment is VACATED AND REMANDED for further proceedings consistent with this opinion. In all other respects, the judgment of the district court is AFFIRMED.

---

[20]If Cassara can prove that DAC failed to adopt reasonable procedures to eliminate systematic errors that it knew about, or should reasonably have been aware of, resulting from procedures followed by its member employers, that this failure resulted in distribution of an inaccurate report that caused him injury, then DAC may be liable to Cassara in damages.

We need not separately address Cassara's claim of defective investigation of his report by DAC because his allegation that DAC "failed to conduct any substantial factual investigation" of the factual basis for its report, (Aplt. Br. at 46), finds no support in the present record, and because his allegations before the district court of internal inconsistencies in DAC's verification of accident data, (Aplee. App. at 42-45, 52-54), depend upon the same categorical consistency problem as his inaccurate reporting claim.