RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0106p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

CHRISTOPHER TWUMASI-ANKRAH,

*Plaintiff-Appellant*,

*v.*

No. 19-3771

CHECKR, INC.,

*Defendant-Appellee*.

─────────────────

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:19-cv-00204—Donald C. Nugent, District Judge.

Decided and Filed:  April 2, 2020

Before:  MOORE, KETHLEDGE, and BUSH, Circuit Judges.

─────────────────

## COUNSEL

**ON BRIEF:**  Sergei Lemberg, LEMBERG LAW LLC, Wilton, Connecticut, for Appellant.
Cindy D. Hanson, TROUTMAN SANDERS LLP, Atlanta, Georgia, Sean T.H. Dutton,
TROUTMAN SANDERS LLP, Chicago, Illinois, for Appellee.

MOORE, J., delivered the opinion of the court in which KETHELEDGE, J., joined.
KETHLEDGE, J. (pg. 12), delivered a separate concurring opinion.  BUSH, J. (pp. 13–16),
delivered a separate dissenting opinion.

─────────────────

## OPINION

─────────────────

KAREN NELSON MOORE, Circuit Judge.  Christopher Twumasi-Ankrah brings this
Fair Credit Reporting Act ("FCRA") case against Checkr, Inc., alleging that Checkr's haphazard

reporting of state car-accident data cost him his job as an Uber driver. The district court dismissed Twumasi-Ankrah's case for failing to comply with what it viewed as the governing legal standard for FCRA cases. But because we conclude that the district court applied a legal standard not in accordance with the statute's text, and that Twumasi-Ankrah states a plausible claim under the properly construed standard, we **REVERSE** the district court's judgment and **REMAND** for further proceedings consistent with this opinion.

## I. BACKGROUND

Because this case arrives to us in the motion-to-dismiss posture, we accept the allegations set forth in Twumasi-Ankrah's complaint as true and draw all reasonable inferences in his favor. *Bickerstaff v. Lucarelli*, 830 F.3d 388, 396 (6th Cir. 2016).

Twumasi-Ankrah is an Uber driver. Checkr is a consumer reporting agency ("CRA"), meaning it "assembl[es] . . . information on consumers for the purpose of furnishing consumer reports to third parties." 15 U.S.C. § 1681a(f); *see also id*. § 1681b(a)(3)(B) (permitting CRAs to furnish consumer reports to employers for "employment purposes").

At some point in time, Uber requested that Checkr perform a background check on Twumasi-Ankrah. As part of that background check, Checkr asked the Ohio Bureau of Motor Vehicles ("BMV") for any information it had about Twumasi-Ankrah's driving history. The BMV informed Checkr, among other things, that Twumasi-Ankrah had been involved in three "accidents," dated (1) October 23, 2015; (2) December 19, 2015; and (3) February 10, 2017. It did not elaborate further.

Checkr passed this information along to Uber, without conducting any further investigation and all while knowing "that the BMV includes in its driving history abstracts all accidents that a driver is involved in, regardless of fault." R.20 (Am. Compl. ¶ 11) (Page ID #111). The relevant portion of Checkr's report thus read as follows:

```
Accidents
** ACCIDENT **                                                          Feb 10, 2017

Accident Date          Feb 10, 2017
City                   SUMMIT
Description            ** ACCIDENT **
Report Number          76019661
State                  OH


** ACCIDENT **                                                          Dec 19, 2015

Accident Date          Dec 19, 2015
City                   CUYAHOGA
Description            ** ACCIDENT **
Report Number          57088925
State                  OH


** ACCIDENT **                                                          Oct 23, 2015

Accident Date          Oct 23, 2015
City                   CUYAHOGA
Description            ** ACCIDENT **
Report Number          54030202
State                  OH


Restrictions

NONE
```

*Id*., Ex. 1 (Page ID #122).

Uber fired Twumasi-Ankrah shortly after receiving Checkr's report. It allegedly did this because it assumed Twumasi-Ankrah was responsible for the three accidents noted therein. *Id*. ¶ 18 (Page ID #112); *see also id*. ¶ 15 ("[It is] reasonable for Uber to assume that, if a [CRA] like [Checkr] reports that a driver was involved in an accident, the driver was at fault in that accident.").

When Twumasi-Ankrah acquired the report that purportedly led to his termination, however, he realized that two of the three accidents reported by Checkr were not his fault. *Id*. ¶ 20. And, as proof of his innocence, Twumasi-Ankrah sent Checkr (1) a legal document adjudging him "not guilty" of the minor traffic offense allegedly at issue in the December 19, 2015 accident, *id*., Ex. 2–3 (Page ID #124–27), and (2) a police report treating him as the victim of the hit-and-run allegedly at issue in the February 10, 2017 accident, *id*., Ex. 4 (Page ID #128–30). But Twumasi-Ankrah's pleas for reconsideration went unheeded. *See id*. ¶ 28 (Page ID #113) (asserting that Checkr "refused to supplement or amend" its report, even after receiving this documentation).

This lawsuit followed. In his complaint, Twumasi-Ankrah claimed that Checkr violated the FCRA because it failed to "follow reasonable procedures to assure [the] maximum possible accuracy" of its reporting on him. 15 U.S.C. § 1681e(b). More specifically, Twumasi-Ankrah

alleged, Checkr "failed to take any steps to verify that all material information regarding the accidents was included in [his] report before furnishing it to Uber," which resulted in Checkr sending Uber information that "was so misleading as to be inaccurate" (because it arguably led Uber to think Twumasi-Ankrah's poor driving caused at least three car accidents). R.20 (Am. Compl. ¶¶ 32–33 (Page ID #114).

Checkr promptly moved to dismiss Twumasi-Ankrah's complaint, contending that Twumasi-Ankrah failed plausibly to allege either (1) that Checkr reported inaccurate information about him, (2) that Checkr's verification procedures were unreasonable, or (3) that Checkr willfully violated his rights.

The district court agreed with Checkr's first rationale and accordingly dismissed Twumasi-Ankrah's suit; it did not discuss Checkr's other two grounds for dismissal. The district court ruled this way because, in its view, "clear" Sixth Circuit precedent established that, to state a claim under the relevant FCRA provision, a plaintiff must allege that a CRA reported "factually inaccurate" information about them. *Twumasi-Ankrah v. Checkr, Inc.*, No. 1:19-cv-204, 2019 WL 3253081, at *3 (N.D. Ohio July 19, 2019) (citing *Dickens v. Trans Union Corp.*, 18 F. App'x 315 (6th Cir. 2001), and *Turner v. Experian Info. Sols., Inc.*, No. 17-3795, 2018 WL 3648282, at *3 (6th Cir. Mar. 1, 2018)). And "factually inaccurate" information, the cited cases said, means literally "factually inaccurate" information; information that is merely "misleading or incomplete in some sense" does not count. *Id.* at *2 (citation omitted); *see also id.* at *3 (deeming this the "technical accuracy standard"). The district court then applied this standard and found that, although Checkr's reporting on Twumasi-Ankrah's driving history was not necessarily complete (because it failed to inform Uber that two of the accidents were not Twumasi-Ankrah's fault or otherwise acknowledge that possibility), it was technically accurate (because Twumasi-Ankrah was *involved* in both accidents, in a general sense). *Id.* at *3.

Twumasi-Ankrah timely appealed the district court's judgment.

## II. DISCUSSION

We review de novo a district court's dismissal of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *Beaudry v. TeleCheck Servs., Inc.*, 579 F.3d 702, 704 (6th Cir.

2009). The touchstone of our review is whether the plaintiff's factual allegations, accepted as true, present a "plausible" claim for relief, such that the plaintiff is entitled to advance into discovery and there gather evidence in support of their claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

**A. Legal Standard**

The relevant provision of the FCRA—15 U.S.C. § 1681e(b)—requires CRAs to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." And if a CRA negligently or willfully violates this mandate, the statute continues, an aggrieved consumer may bring suit. *Id*. § 1681n (allowing private right of action for willful noncompliance), § 1681*o* (same, for negligent noncompliance).

We have held (in an unpublished opinion) that to state a claim under § 1681e(b) a plaintiff must show "(1) the defendant reported inaccurate information about the plaintiff; (2) the defendant either negligently or willfully failed to follow reasonable procedures to assure maximum possible accuracy of the information about the plaintiff; (3) the plaintiff was injured; and (4) the defendant's conduct was the proximate cause of the plaintiff's injury." *Nelski v. Trans Union, LLC*, 86 F. App'x 840, 844 (6th Cir. 2004). *But see Beaudry*, 579 F.3d at 707 (clarifying that a plaintiff does not need to prove injury, outside that necessary to establish Article III standing, when seeking statutory damages for a willful violation of the Act). We have further held (again in unpublished opinions) that "inaccurate information" means "technically [in]accurate" information, *not* information that "was so misleading as to be inaccurate." *Dickens v. Trans Union Corp.*, 18 F. App'x 315, 318 (6th Cir. 2001); *see also Turner v. Experian Info. Sols., Inc.*, No. 17-3795, 2018 WL 3648282, at *3 (6th Cir. Mar. 1, 2018) (repeating this language).

The meaning of this first element—the inaccuracy element—lies at the heart of this appeal. Checkr contends that the technical-accuracy standard constitutes the law of the circuit, and that Twumasi-Ankrah failed to state a claim under that standard. Twumasi-Ankrah responds that certain kinds of misleading information still constitute inaccurate information, prior case law

notwithstanding, and that he has sufficiently alleged that Checkr reported such misleading information here.

Notably, the parties' dispute reflects ongoing confusion among our district courts, who have failed to coalesce around a single definition of "inaccuracy." *Compare, e.g.*, *Poore v. Sterling Testing Sys., Inc.*, 410 F. Supp. 2d 557, 570 (E.D. Ky. 2006) ("A report is inaccurate when it is patently incorrect *or* when it is misleading in such a way and to such an extent that it can be expected to have an adverse effect." (emphasis added) (citing *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 415 (4th Cir. 2001)) *with Twumasi-Ankrah*, 2019 WL 3253081, at *3 (declaring *Poore* inapposite because it "cited a Fourth Circuit case for [its] purported accuracy test" and instead applying technical-accuracy standard).

In light of this confusion, we now take the opportunity to hold that, to state the first element of a claim under § 1681e(b), a plaintiff may allege that a CRA reported either "patently incorrect" information about them *or* information that was "misleading in such a way and to such an extent that it [could have been] expected to have an adverse effect [on the consumer]." *Dalton*, 257 F.3d at 415 (alterations omitted). This conclusion accords with the text of the statute, our case law governing adjacent sections of the statute, and the views of virtually every other circuit court to have considered the issue. To the extent our prior decisions implied otherwise, that was error.

*Text*: Section 1681e(b) states that CRAs "shall follow reasonable procedures to assure *maximum possible* accuracy of the information concerning the individual about whom the report relates." This emphasized language suggests that Congress wanted to hold CRAs to a higher standard than mere technical accuracy. *See Cortez v. Trans Union, LLC*, 617 F.3d 688, 709 (3d Cir. 2010) (describing the "distinction between 'accuracy' and 'maximum possible accuracy'" as "quite dramatic"). After all, if a CRA reports that a victim of a credit-card scam was "involved" in a credit-card scam, but then fails to note that the reportee was a *victim* of the scam, it is hard to describe the CRA's reporting as "maximumly accurate," even though it may have been "accurate" in a technical sense. *See Pinner v. Schmidt*, 805 F.2d 1258, 1263 (5th Cir. 1986) (offering this example). What's more, a brief tour of § 1681e(b)'s surrounding provisions shows that Congress was concerned with "incomplete" credit reporting as much as it was with

"inaccurate" credit reporting. *See, e.g.*, 15 U.S.C. § 1681b(b)(3)(B)(i)(IV) (allowing consumers to "dispute with the [CRA] the accuracy *or completeness* of any information" in certain kinds of employment-based reports) (emphasis added); *id.* § 1681i(a)(1)(A) (similar standard when consumer requests that CRA reinvestigate its initial report); *id.* § 1681i(a)(5)(A) (same). This, too, cautions against reading a narrow technical-accuracy standard into the section. *See King v. Burwell*, 135 S. Ct. 2480, 2492 (2015) ("[It is a] fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme") (citation omitted).

*Adjacent Case Law*: Our published case law concerning § 1681s-2(b)—the portion of the FCRA dealing with entities who furnish raw data to CRAs, like the Ohio BMV in this case—confirms the logic of this result. Section 1681s-2(b) allows a consumer to sue a data furnisher if the furnisher provides "incomplete or inaccurate" information to a CRA and then refuses to "delete" or "modify" that information in response to a consumer complaint. 15 U.S.C. § 1681s-2(b)(1). Yet we have interpreted the phrase "incomplete or inaccurate" to encompass not only "false information," but also "correct information" that nevertheless "create[s] a materially misleading impression." *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 617 (6th Cir. 2012) (quoting *Saunders v. Branch Banking & Tr. Co. of Va.*, 526 F.3d 142, 148 (4th Cir. 2008)). Why should a different, technical-accuracy standard apply here? After all, bad behavior among CRAs, not furnishers, initially drove the passage of the FCRA. *See Chiang v. Verizon New England, Inc.*, 595 F.3d 26, 35 (1st Cir. 2010) (noting that furnishers were not regulated under the FCRA until 1996, when Congress amended the statute). And materially misleading information can be just as damaging to a consumer when it comes from a CRA as opposed to when it comes from a furnisher. Avoiding needless asymmetry thus provides another reason to rule as we do.

*Other Circuits*: Finally, although we are not bound by the law of our sister circuits, we find it noteworthy that every circuit to have considered whether to apply a technical-accuracy standard under § 1681e(b) has declined to do so and has instead adopted an "inaccurate or misleading" standard using reasoning largely analogous to that set forth above. *See, e.g.*, *Schweitzer v. Equifax Info. Sols., Inc.*, 441 F. App'x 896, 902 (3d Cir. 2011); *Dalton*, 257 F.3d at

415; *Sepulvado v. CSC Credit Servs., Inc.*, 158 F.3d 890, 895–96 (5th Cir. 1998); *Koropoulos v. Credit Bureau, Inc.*, 734 F.2d 37, 39–43 (D.C. Cir. 1984); *cf. Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 890–91 (9th Cir. 2010).  And of the two circuits to decline to rule one way or the other on the issue, one of those circuits nonetheless took care to emphasize that the "better reading" of the statute is the one we adopt here.  *See Pedro v. Equifax, Inc.*, 868 F.3d 1275, 1281 (11th Cir. 2017) ("[T]he better reading of the Act requires that credit reports be both accurate and not misleading[.]").[1]  We see no reason to depart from this consensus.

* * *

Checkr does not dispute this analysis.  Rather, Checkr contends, because we applied the technical-accuracy standard in two unpublished decisions, *see Dickens*, 18 F. App'x at 318; *Turner*, 2018 WL 3648282, at *3, and because Twumasi-Ankrah does not ask us expressly to overrule those decisions, we are dutybound to follow that prior case law.  *See* Appellee Br. at 19 (describing *Dickens* and *Turner* as "longstanding precedent").  This framing, however, misstates both Twumasi-Ankrah's briefing and the nature of our decisionmaking process.

For one, although Twumasi-Ankrah did state that we "need not . . . overturn . . . *Dickens* and *Turner*" to rule in his favor, Appellant Br. at 31, a fair reading of his brief shows that he is advocating essentially for an "inaccurate or misleading" standard analogous to the one we adopt here, *see, e.g.*, *id.* at 18–19 (setting forth proposed standard), *id.* at 27–29 (citing law of other circuits).  The question of whether the FCRA imposes a technical-accuracy standard on § 1681e(b) plaintiffs is thus squarely before us.

More importantly, though, because *Dickens* and *Turner* are unpublished decisions they are not "precedent," Appellee Br. at 19, and they do not bind us.  *See Bell v. Johnson*, 308 F.3d 594, 611 (6th Cir. 2002) ("It is well-established law in this circuit that unpublished cases are not binding precedent.").  Although our unpublished case law is valuable insofar as it is persuasive and correctly identifies governing legal principles, when it fails to meet that standard we will not hesitate to correct course.  *See, e.g.*, *Beaudry*, 579 F.3d at 707 (declining to follow unpublished

---

[1]The Eighth Circuit has also declined to take a side on this issue, albeit without hinting at its thoughts on the ultimate question.  *See Taylor v. Tenant Tracker, Inc.*, 710 F.3d 824, 827 n.2 (8th Cir. 2013).

case law interpreting different element of § 1681e(b)). And, here, we correct course because *Dickens* relied on the mistaken assertion that we "adopted" a "technical accuracy approach" in *Spence v. TRW, Inc.*, 92 F.3d 380 (6th Cir. 1996), per the Eleventh's Circuit decision in *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151 (11th Cir. 1991). *See Dickens*, 18 F. App'x at 318. But not only does *Spence* say nothing about this issue, *Cahlin* expressly held that it was *not* deciding whether to adopt a "technical accuracy approach." *See Cahlin*, 936 F.2d at 1157; *see also Williams v. Capital One Bank (USA) N.A.*, 785 F. App'x 741, 747 (11th Cir. 2019) (recognizing *Cahlin*'s indeterminate holding). *Turner* then compounded the error by citing *Dickens* for the proposition that we had in fact adopted a technical-accuracy standard. *See Turner*, 2018 WL 3648282, at *3. For this reason, to the extent *Dickens* and *Turner* suggested that we apply a technical-accuracy standard in this circuit, that was error.

## B. Analysis

With this understanding of the law in hand, we now ask whether Twumasi-Ankrah has stated a plausible claim under § 1681e(b), at least with respect to the inaccuracy element. We conclude that he has.

Again, Twumasi-Ankrah alleges the following key facts. One, based upon raw data culled from the Ohio BMV, Checkr told Twumasi-Ankrah's employer, Uber, that Twumasi-Ankrah had been involved in three car accidents in the last three years, but it did not investigate or elaborate beyond that. Two, Checkr's reporting was misleading because (a) the Ohio BMV keeps a record of all accidents regardless of fault and (b) other public records show that two of three accidents reported by Checkr were not Twumasi-Ankrah's fault; indeed, one of the "accidents" reported by Checkr was a hit-and-run in which Twumasi-Ankah was the victim. Three, because Uber assumes that if a CRA reports that a driver was involved in an accident the driver was responsible for the accident, Checkr's reporting led Uber to believe Twumasi-Ankrah was a more careless driver than he was. Four, Uber fired Twumasi-Ankrah because of this misperception.

Taken as true, these allegations plausibly suggest that Checkr reported "misleading" information about Twumasi-Ankrah that could have been "expected to have an adverse effect"

on him. *Dalton*, 257 F.3d at 415. That is enough to survive a motion to dismiss. *Cf. Pinner*, 805 F.2d at 1262–63 (affirming jury verdict for consumer in § 1681e(b) case because "any person could easily have" been misled by a CRA reporting that "litigation [was] pending" with respect to one of the consumer's debts but without clarifying that the consumer was the *plaintiff* in the pending litigation).

Checkr resists this conclusion in two ways.

Checkr contends first that because "the plain meaning" of the word "accident" "has long maintained no negative connotation regarding fault," it is not plausible that Uber interpreted the report as Twumasi-Ankrah alleges it did. Appellee Br. at 29. This is especially so, Checkr continues, because the report listed "violations" separately from "accidents." *Id*. at 30. But "accident" is a more complicated word than Checkr gives it credit. *See, e.g.*, *Cassara v. DAC Servs., Inc.*, 276 F.3d 1210, 1219–26 (10th Cir. 2002) (extended discussion). And, even if Uber did interpret the report as Checkr suggests it did, that kind of factual determination is best left for summary judgment, after the completion of discovery.

Checkr also asserts that it is "more plausible" that Uber fired Twumasi-Ankrah because of other driving issues denoted in Checkr's report than because of the three accidents, and that we should affirm the district court's judgment on this alternative basis. Appellee Br. at 35–36. But accepting this argument would require us to ignore the factual allegations contained in Twumasi-Ankrah's complaint, which we cannot do at this preliminary stage. *Bickerstaff*, 830 F.3d at 396. And, in any event, this kind of "competing plausibility" analysis rarely is appropriate at the motion-to-dismiss juncture; we will not consider it here. *See Twombly*, 550 U.S. at 556 (distinguishing "plausibility" from "probability").

\* \* \*

We acknowledge that Checkr raised two other grounds for dismissal in its motion to dismiss. *See supra* at 4 (noting those grounds). But because the district court has not yet had an opportunity to opine on those arguments, we decline to address them here. Similarly, to the extent Twumasi-Ankrah is requesting permission to amend his complaint to add an additional

claim under 15 U.S.C. § 1681i(a), *see* Reply Br. at 11–13, we conclude that that, too, is an issue best left for the district court to resolve on remand.

### III.  CONCLUSION

For these reasons, we **REVERSE** the district court's judgment and **REMAND** for further proceedings consistent with this opinion.

———————————

**CONCURRENCE**

———————————

KETHLEDGE, Circuit Judge, concurring. I join the court's opinion with the following observations. The complaint here states a claim only if it plausibly alleges two things: first, that Checkr's report was misleading—which is to say, that it was not as accurate as it could have been had Checkr followed "reasonable procedures" in preparing it, *see* 15 U.S.C. § 1681e(b); and second, that the report's allegedly misleading character proximately caused Uber to fire Twumasi-Ankrah. Proximate causation may be hard to prove, given that Checkr accurately reported that Twumasi-Ankrah had two moving violations and a "noncompliance suspension" (whatever that might be) during the reporting period, and that he apparently does not dispute fault for one of the three accidents on his report. I also have my doubts that the report's recitation of "accidents" implied that Twumasi-Ankrah was at fault for them. And it is by no means clear that the "investigation" in which Twumasi-Ankrah says Checkr should have engaged would fall within the "reasonable procedures" required by the Act. But for now at least I agree that Twumasi-Ankrah has plausibly alleged these things—albeit barely.

---------------

**DISSENT**

---------------

JOHN K. BUSH, Circuit Judge, dissenting.  I agree with the majority that the words "maximum possible accuracy" require CRAs to produce consumer reports that are more than just technically accurate.  *See* 15 U.S.C. § 1681e(b).  However, I would affirm the district court's judgment of dismissal because the amended complaint did not plausibly allege that there was misleading information in Checkr's report or that the misleading information caused Uber to fire Twumasi-Ankrah.

The Fair Credit Reporting Act states, in pertinent part: "Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assume maximum possible accuracy of the information concerning the individual about whom the report relates." *Id.*  One dictionary defines "maximum" as "the greatest quantity or value attainable or attained"[1] and "possible" as "being within the limits of ability, capacity, or realization."[2]  Based on these common understandings of the statutory terms, I read the words "maximum possible" before "accuracy" to mean that the information disclosed by the CRA must have the greatest accuracy that can be obtained within the limits of the CRA's capacity.  In construing 15 U.S.C. § 1681e(b), we follow the fundamental rule of statutory interpretation that "we must give effect to every word of a statute wherever possible." *United States v. Collins*, 683 F.3d 697, 706 (6th Cir. 2012) (quoting *Leocal v. Ashcroft*, 543 U.S. 1, 12 (2004)).  If merely "technical accuracy" were the proper standard, then the words "maximum" and "possible" would be superfluous.  We must give some meaning to those words, and I therefore agree with the majority that § 1681e(b)'s "accuracy" requirement imposes a duty to avoid not only patently incorrect information but also information that was "misleading in such a way and to such an extent that it

---

[1]*Maximum*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/maximum (last visited Mar. 30, 2020).

[2]*Possible*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/possible (last visited Mar. 30, 2020).

[could have been] expected to have an adverse effect [on the consumer]." (Majority Opinion at ¶ 22) (citing *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 415 (4th Cir. 2001)).

Here, Twumasi-Ankrah seeks recovery on the sole theory that Checkr's report contained a material omission—who was at fault in the three accidents it reported from the BMV. Our circuit's case law supports the rule that material omissions, like incorrect statements, can cause reports to be inaccurate within the meaning of the FCRA. *See Pittman v. Experian Info Solutions, Inc.*, 901 F.3d 619, 629 n.5 (6th Cir. 2018) (requiring that information disclosed by the CRA be both not "inaccurate" and not "incomplete."); *see also Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 617 (6th Cir. 2012) (citing *Sepulvado v. CSC Credit Servs., Inc.*, 158 F.3d 890, 895–96 (5th Cir. 1998) as a case that "interpret[ed] [the] 'accuracy' requirement under § 1681e(b) to impose a duty to avoid material omissions").

So, the question is whether Twumasi-Ankrah adequately alleged that Checkr's omission of who was at fault in the accident was material, i.e. whether it caused the report to be so misleading that it "[could have been] expected to have an adverse effect" on Twumasi-Ankrah's employment prospects with Uber. *Dalton*, 257 F.3d at 415 (4th Cir. 2001) (citation and alterations omitted). I would hold that the amended complaint did not make this showing. I agree that in certain circumstances the omission of who was at fault could be a material omission as to the mere reporting of an "accident." The latter term, standing alone, is ambiguous enough that sometimes it could lead a reasonable reader to ascribe fault. *See, e.g., Cassara v. DAC Servs., Inc.*, 276 F.3d 1210, 1225–26 (10th Cir. 2002) (holding that a jury question arose as to accuracy of a report stating that driver had been in accidents and the criteria for what constituted an "accident" was not uniformly defined for furnishers of accident information). Here, however, it is implausible that Checkr's non-disclosure of who was at fault in the accidents could have affected Uber's decision to terminate Twumasi-Ankrah's employment.

First, the term "accident" *was* adequately defined by the Ohio BMV, at least enough to dispose of Twumasi-Ankrah's claim that the term labelled him as being at fault. The BMV website stated the following as to what its reporting of an accident meant regarding fault:

> When an individual is involved in a motor vehicle crash and a police report is made, *all parties listed on the report have an entry of the crash placed on their*

*driving records*.  When the entry is placed on the record, no points are assessed and *it does not specify who was at fault.***3**

Simply put, the BMV explained that the word "accident" was not meant to ascribe fault to any party.  Twumasi-Ankrah alleges no facts explaining how Uber, a sophisticated international corporation in the transportation industry, could have been misled—he merely speculates that Uber "assumed" he was at fault.  *See 16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013) ("[A] plaintiff cannot overcome a Rule 12(b)(6) motion to dismiss simply by referring to conclusory allegations in the complaint").

Second, a separate section of the report is entitled "Violations" and lists all traffic infractions found on his record.  None of the accidents listed immediately thereafter have any corresponding traffic violations listed on the report.  Because Twumasi-Ankrah was never cited for any of these accidents, the implication from the report itself is that he was not at fault.**4**

Third, Twumasi-Ankrah had a miscellaneous traffic violation, a speeding violation, and a non-compliance suspension of Twumasi-Ankrah's license all within four years of the filing of his complaint.  Given these circumstances, it is implausible to assume that Checkr's disclosure of who was at fault could have had an effect on Twumasi-Ankrah's employment prospects with Uber.  *See Dalton*, 257 F.3d at 415 (4th Cir. 2001) (citation and alterations omitted).  Therefore, Twumasi-Ankrah fails to properly allege that Checkr's report was inaccurate.

For similar reasons I would also hold that Twumasi-Ankrah's claim does not satisfy the causation element; that is, Twuamsi-Ankrah failed to plausibly allege that the report's allegedly misleading character proximately caused Uber to fire him.

---

**3***More Services: Crash Information*, Oʜɪᴏ BMV, www.bmv.ohio.gov/more-crashreports.aspx (last visited Mar. 30, 2020) (emphasis added). Judicial notice of this message from the BMV website was appropriate because it is an official record from a government website, *see Bailey v. City of Ann Arbor*, 860 F.3d 382, 386 (citing *New Eng. Health Care Emps. Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003)) ("[A] court ruling on a motion to dismiss '*may* consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice"), and Twuamsi-Ankrah does not challenge on appeal the district court's taking of such judicial notice.

**4**The Ohio BMV website supports this reading of the report.  *See General Information on the Ohio Driver Abstract*, Oʜɪᴏ BMV, http://publicsafety.ohio.gov/links/bmv3344.pdf (last visited Mar. 30, 2020) ("Under normal circumstances, a moving violation conviction carrying the same date as the accident report will imply fault in the crash.  The lack of a conviction would, therefore, imply that the driver was not at fault.").

Twumasi-Ankrah may complain that the driving-record reporting process used by Uber and Checkr is unfair to him as a driver, and indeed it may not be fair if Uber fired him simply because he was involved in three accidents even though he was never at fault. However, the FCRA does not require that Uber make fair decisions as to whether the fire a driver based on his accident record. Rather, it imposes liability on Checkr, as a CRA, only if it does not "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). Twumasi-Ankrah has not plausibly alleged that Checkr made any material omission as to the reporting of his accidents, nor has he plausibly alleged that any omission caused his termination. For these reasons, I respectfully dissent.