[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-11587

_____

D.C. Docket No. 1:16-cv-01894-ODE

KEITH WILLIAM ERICKSON,

Plaintiff-Appellant,

versus

FIRST ADVANTAGE BACKGROUND SERVICES CORP.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(December 4, 2020)

Before GRANT and MARCUS, Circuit Judges, and AXON,[*] District Judge.

GRANT, Circuit Judge:

_____

[*] Honorable Annemarie C. Axon, United States District Judge for the Northern District of Alabama, sitting by designation.

Keith Erickson had his heart set on coaching his son's Little League team. He authorized a search of sex-offender records as part of his application, apparently without much worry—his record was entirely clean. To his surprise, he soon received a letter in the mail from First Advantage, the consumer reporting agency that performed the search. That letter brought unwelcome news: Erickson's name had returned a match. Though Erickson's own record was clear, his estranged father's was not. And because the two shared a name, the name-only search that Little League requested had flagged his father's record.

Erickson eventually sued First Advantage, claiming that the company's upsetting report failed to comply with the Fair Credit Reporting Act's "maximum possible accuracy" standard. The question for us is what that standard requires. The answer is that a report must be both factually correct and free from potential for misunderstanding. And because the report here met that standard, we affirm.

I.

As we've already said, Keith Erickson signed up to serve as an assistant coach for his oldest son's Little League team—a role he had filled twice before. When he signed his application, Erickson authorized Little League to run a background check, which included a search of registered sex-offender records. He provided Little League with his name (at the time, Keith Dodgson), as well as his date of birth, social security number, and home address.

Little League passed this information on to First Advantage, a consumer reporting agency it had worked with for several years to obtain background reports on its applicants. According to its agreement with Little League, First Advantage

2

enters applicants' information into its own database to search for matching criminal and sex-offender registry records. That database includes records and files purchased from Experian Public Records, Inc., which is yet another consumer reporting agency.

In a typical search for sex-offender records, First Advantage inputs an applicant's name, complete date of birth, and, if available, Social Security number. It is not uncommon for the database to contain a sex-offender registry record without the underlying record of conviction. And for some jurisdictions, including the one at play here, First Advantage's database (for reasons that are unclear and not challenged) only contains sex offenders' names and birth years, but not complete dates of birth. In an attempt to cast a broad net where information is incomplete, the Little League agreement specifies that First Advantage will search for sex-offender records using only an applicant's first and last name in any jurisdictions where the database lacks those complete dates of birth. And if one of those name-only searches returns a result, Little League in turn would need to review available demographic data from the relevant State's website before determining that a sex-offender record actually belongs to an applicant.

That brings us to the facts behind this case, none of which are in dispute. At the direction of Little League, First Advantage searched its database using Erickson's identifying information and did not find any matching criminal records. But it did find a sex-offender record: a "Keith Dodgson" in Pennsylvania. That

3

match was obtained by a name-only search because the database did not include the sex offenders' complete dates of birth.

First Advantage prepared a background report on Erickson to send to Little League. After identifying the sex-offender record that matched Erickson's name, the report stated "This Record is matched by First Name, Last Name ONLY and may not belong to your subject. Your further review of the State Sex Offender Website is required in order to determine if this is your subject." The report then directed Little League to Pennsylvania's sex-offender data to compare the "demographic data and available photographs," noting that Little League might "conclude that the records do not belong to" Erickson.

First Advantage also sent Erickson a letter informing him that he "share[d] the same name with a known criminal or registered sex offender" and that the record would be sent to Little League for review. The letter noted that "Little League is aware this record may not be yours" and explained that Little League was "committed" to investigating further if it planned to deny Erickson's application based on the report. It also stated that the potential match was confidential and would not be provided to anyone outside of Little League. Finally, the report itself assured Erickson that if Little League planned to take "adverse action based in whole or in part on the contents of this report," it must first provide him with a copy of the report.

Any non-sex offender would likely feel worried after receiving that kind of report—but Erickson was devastated. He shared a name with his biological father,

and though he had severed all contact years before, he knew that his father was the source of the match.

He went into damage control mode. Erickson called First Advantage to explain the situation, and his wife contacted Little League. A First Advantage representative explained that the match was based only on his name, and a Little League affiliate explained that this kind of thing "happens." Still, though it was unclear whether anyone at Little League had even seen the report yet, Erickson decided not to coach his son's team because of his humiliation.

To avoid further association with his father, Erickson and his wife decided to change their family's last name from Dodgson to Erickson—a decision that particularly stung Erickson, who had been known by his last name throughout his military career. What's more, military rules required him to disclose the reason for his name change to others in his chain of command, a process that he reports was painful. Erickson also made numerous disclosures to colleagues, neighbors, and friends about his father's status as a registered sex offender to explain why his family no longer went by the name "Dodgson."

Two months after receiving the sex-offender notification, Erickson initiated this lawsuit against First Advantage, alleging that the company failed to "follow reasonable procedures to assure maximum possible accuracy" of the information concerning Erickson in the report, in violation of the Fair Credit Reporting Act. 15 U.S.C. § 1681e(b). To succeed, Erickson needed to show both that First

5

Advantage's report failed to comply with the Act's "maximum possible accuracy" standard and that the report caused him harm.  *Id.*

A jury trial followed.  Erickson called three witnesses—himself, his wife, and First Advantage's Vice President of Operations—and introduced, among other exhibits, his application to coach, the background report, and the notification letter.  After he rested his case, First Advantage moved for judgment as a matter of law.  The district court granted the motion, finding that Erickson had failed to establish two essential elements of his case: that the report was inaccurate and that it caused him harm.  This appeal followed.

## II.

We review a district court's grant of judgment as a matter of law de novo, applying the same standards as the district court.  *Slicker v. Jackson*, 215 F.3d 1225, 1229 (11th Cir. 2000).  Judgment as a matter of law is appropriate only if "reasonable people could not arrive at a contrary verdict."  *Bogle v. Orange Cnty. Bd. of Cnty. Comm'rs*, 162 F.3d 653, 656 (11th Cir. 1998) (quotation omitted).  We view the evidence and reasonable inferences drawn from it in "the light most favorable to the nonmoving party."  *Eghnayem v. Bos. Sci. Corp.*, 873 F.3d 1304, 1313 (11th Cir. 2017).

We review evidentiary rulings for abuse of discretion.  *United States v. Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004).  A district court abuses its discretion "if it applies an incorrect legal standard, follows improper procedures in making the determination, or makes findings of fact that are clearly erroneous."  *Chi. Trib. Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1309 (11th Cir.

6

2001). It enjoys "considerable leeway" in making evidentiary decisions. *Frazier*, 387 F.3d at 1258 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)).

### III.

On appeal, Erickson raises three arguments, though our rejection of the first turns out to be enough to resolve his case. That argument is that First Advantage's report violated the Fair Credit Reporting Act's "maximum possible accuracy" standard because it was false and misleading. Erickson follows up with an evidentiary argument related to his contention that First Advantage not only violated the Act, but did so willfully, opening the door to punitive damages. And finally, he says that the entire damages phase of the case should be retried because he was not allowed to enter evidence of his name change and subsequent disclosures at trial in support of his theory of reputational harm. Because we conclude that First Advantage did not violate the Act, there can be no willful violation; nor can there be any actionable reputational harm.

### A.

Before analyzing Erickson's "maximum possible accuracy" argument, we offer some background about the Fair Credit Reporting Act as a whole. One of the Act's stated purposes is to ensure fair and accurate reporting about consumers. 15 U.S.C. § 1681(a)–(b). To that end, it imposes various requirements on consumer reporting agencies. One of those requirements is that consumer reporting agencies "follow reasonable procedures" to ensure "maximum possible accuracy" of information in consumer reports. 15 U.S.C. § 1681e(b). Consumers harmed when

a consumer reporting agency fails to live up to that duty also have a private right of action under the Act.  15 U.S.C. § 1681n.

We have previously explained that to make out a claim for a violation of § 1681e(b), a plaintiff must show at least two things: that a consumer report was inaccurate and that the inaccurate report caused him to suffer damages.  *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1156, 1161 (11th Cir. 1991).  And absent those showings—particularly the inaccurate report—the reasonableness of the reporting agency's procedures turns out not to matter.  *Id*. at 1156.  Here, the district court saw Erickson's case as doubly deficient—it concluded that the report to Little League was not "materially misleading" and that it did not damage Erickson in any event.  Erickson of course disagrees.  So, taking first things first, we need to consider whether the report provided to Little League was accurate— that is, whether it complied with the "maximum possible accuracy" standard of § 1681e(b).  If it did, Erickson's case goes no further.

This Court has not yet decided exactly what the "maximum possible accuracy" standard entails.  *Id*. at 1157; *see also Pedro v. Equifax, Inc.*, 868 F.3d 1275, 1281 (11th Cir. 2017) (stating in dicta that "the better reading of the Act requires that credit reports be both accurate and not misleading").  District courts in our Circuit, meanwhile, have taken a variety of approaches: sometimes declining to set a particular standard, sometimes analyzing whether the report was both correct and not misleading, and other times reading the Act to require only that information be "technically accurate"—that is, not false.  *See, e.g.*, *Heupel v. Trans Union LLC*, 193 F. Supp. 2d 1234, 1240 (N.D. Ala. 2002) (requiring only technical

8

accuracy); *Johnson v. Equifax, Inc.*, 510 F. Supp. 2d 638, 646 (S.D. Ala. 2007) (analyzing both whether the report was technically accurate and whether it was misleading); *Smith v. E-Backgroundchecks.com, Inc.*, 81 F. Supp. 3d 1342, 1357 n.18 (N.D. Ga. 2015) (describing the standard as "more than merely allowing for the possibility of accuracy" (quotation omitted)).  Other courts have read it to require that information be factually true and neither misleading nor incomplete. *See, e.g.*, *Koropoulos v. Credit Bureau, Inc.*, 734 F.2d 37, 40–44 (D.C. Cir. 1984).

We don't see why the Act should not be read to require that a report be both technically accurate and not misleading—in fact, we think that is what the statutory text demands.  After all, the Fair Credit Reporting Act requires more than just accuracy in consumer reports—it requires "maximum possible accuracy."  The words "maximum" and "possible" mean "greatest in quantity or highest in degree attainable" and "falling or lying within the powers" of an agent or activity. *Webster's Third New International Dictionary* 1396, 1771 (3d ed. 1961); *see also American Heritage Dictionary of the English Language* 808, 1023 (1979) (defining "maximum" as "greatest possible quantity, degree, or number" and "possible" as "[c]apable of happening, existing, or being true without contradicting proven facts, laws, or circumstances").

"Accuracy," in turn, means "freedom from mistake or error."  *Webster's Third New International Dictionary* 13; *see also American Heritage Dictionary* 9 ("[e]xactness; correctness").  And being free from "mistake" or "error" means being free from "a misunderstanding of the meaning or implication of something" and not deviating from "truth or accuracy."  *Webster's Third New International*

9

*Dictionary* 772, 1446; *see also American Heritage Dictionary* 445, 840 (defining "mistake" as "error or fault" or a "misconception or misunderstanding," and "error" as an "act, assertion, or belief that unintentionally deviates from what is correct, right, or true").

These definitions all point in one direction: that to reach "maximum possible accuracy," information must be factually true and also unlikely to lead to a misunderstanding. Under that standard, a report that contains factually incorrect information is plainly inaccurate under the Fair Credit Reporting Act. So too for a report that contains factually correct information but nonetheless misleads its users as to its meaning or implication. Similar understandings of the Act find support in other circuits. *Dalton v. Cap. Associated Indus., Inc.*, 257 F.3d 409, 415 (4th Cir. 2001); *Sepulvado v. CSC Credit Servs., Inc.*, 158 F.3d 890, 895 (5th Cir. 1998); *Twumasi-Ankrah v. Checkr, Inc.*, 954 F.3d 938, 942 (6th Cir. 2020); *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir. 2009).

One thing to add—whether a report is misleading is an objective measure, one "that should be interpreted in an evenhanded manner toward the interests of both consumers and potential creditors in fair and accurate credit reporting." *Cahlin*, 936 F.2d at 1158. Though we declined to adopt a particular standard in *Cahlin*, we explained that any "maximum possible accuracy" standard must be applied objectively. *Id.* So when evaluating whether a report is accurate under the Act, we look to the objectively reasonable interpretations of the report. If a report is so misleading that it is objectively likely to cause the intended user to take adverse action against its subject, it is not maximally accurate. On the other hand,

10

the fact that some user somewhere could possibly squint at a report and imagine a reason to think twice about its subject would not render the report objectively misleading.

In sum, a report must be factually incorrect, objectively likely to mislead its intended user, or both to violate the maximal accuracy standard of the Fair Credit Reporting Act.

## B.

Having defined the standard for "maximum possible accuracy," we now apply it. To begin, the Little League report was factually correct. The report stated that a registered sex offender in Pennsylvania shared Erickson's first and last name. True. And the report did not wrongfully attribute that record to Erickson. Closer to the opposite, in fact—it explained that the matching record was located using a name-only search and cautioned that the record might not be Erickson's at all.

Erickson says this is not enough. He argues that the report was "patently inaccurate": it was requested for him, it included a sex-offender record, and he is not a sex offender. But his conclusion just does not follow from his premises. The report never assigned the sex-offender record to Erickson, and again, it suggested that the record might *not* be connected to him. Simply put, the report was what it said it was—an alert that someone by the name of Keith Dodgson had a Pennsylvania sex-offender record.

That brings us to the second prong of the test—whether the report was misleading. And here, the only objectively reasonable interpretation of the report

11

was one that was *not* misleading.  A reasonable user of the report standing in the shoes of Little League—that is, a user who had hired a consumer reporting agency to search an internal database for sex-offender records, knowing that some searches would be performed only by name and knowing that further research was required before attributing any of those matched records to a particular individual—would not be misled by the report to such an extent that it would take negative action against Erickson.  Little League knew that it would get what it asked for here—a search based only on first and last name.  And it also knew that it could not attribute any of those matched records to an applicant without conducting further research first.

In fact, the report reminded Little League that "further review of the State Sex Offender Website" was *required* in order to determine if the record was Erickson's.  A reasonable user would not take adverse action against Erickson based on this report because the only reasonable understanding of it was that someone with Erickson's name was a registered sex offender in Pennsylvania—not that Erickson himself was that person.

To be sure, this is not a license to caveat one's way out of liability for an affirmatively misleading report.  We have all run into large-print headlines or promises that are belied by the lengthy fine print at the bottom.  That kind of report would be objectively misleading.  Nor will vague equivocations like "the criminal history cited may not be 100 percent accurate" suffice to save an otherwise misleading report.  Some cases will be closer than this one, and require tighter judgment calls about whether a report is misleading.  But here, the report's

12

language made clear what the report was and was not, and it was prepared consistent with the expectations of the requester.

At bottom, this report was both factually correct and free from potential for misunderstanding. Erickson cannot establish that it was false as a technical matter or that it was likely to mislead its recipient to such an extent that the recipient would take adverse action against Erickson. That means that he failed to prove that the report violated the "maximum possible accuracy" standard of § 1681e(b). And having failed in that way, he cannot make out a prima facie claim under § 1681n. Because Erickson's claim that the report was not maximally accurate cannot go on, we need not consider the district court's independent ground for granting judgment as a matter of law—that the report did not cause Erickson harm.

C.

Erickson also challenges two of the district court's pretrial evidentiary rulings, arguing that the district court's exclusion of evidence of First Advantage's financial condition and of evidence surrounding his own name change were improper. But both of these pieces of evidence were only relevant for proving damages. And because we already rejected his § 1681e(b) claim on the accuracy point, giving Erickson a chance to prove damages will not help his case. We therefore do not consider either of his secondary claims of error.

\*        \*        \*

Erickson did not establish an essential element of his claim—that the report prepared by First Advantage violated the Fair Credit Reporting Act's "maximum possible accuracy" standard through technical inaccuracy or because it was

13

objectively misleading to its intended user. It may well be that the report harmed Erickson, not because of any inaccuracies, but because it brought to light the difficult past of his estranged father. But an accurate report is not actionable under the Act, no matter how embarrassing or hurtful it may prove. Because judgment as a matter of law was appropriate, we **AFFIRM** the district court.